Case No. 15-30592

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

YOLANDE BURST, Individually, and as the Legal Representative of Bernard Ernest Burst, Jr.,

Plaintiff–Appellant,

v.

SHELL OIL COMPANY; CHEVRON USA, INCORPORATED; TEXACO, INCORPORATED,

Defendants–Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

_____

## APPELLEES' BRIEF

_____

Lauren Tanner Bradley
BAKER BOTTS L.L.P.
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
(512) 322-2500
(512) 322-2501 (fax)

Macey Reasoner Stokes
Amy Pharr Hefley
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1234
(214) 229-7869 (fax)

*Counsel for Appellees Shell Oil Company; Chevron U.S.A. Inc.; and Texaco Inc.*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

A.     PLAINTIFF/APPELLANT:

Yolande Burst

Richard J. Fernandez
Amber E. Cisney
Richard J. Fernandez, LLC
3000 W. Esplanade Ave.
Metairie, Louisiana 70002
(504) 834-8500

Lynn Eric Williams, Jr.
Williams Law Office, LLC
433 Metairie Rd., Suite 401
Metairie, Louisiana 70005
(504) 832-9898
eric@amlbenzene.net

Keith E. Patton
Shrader & Associates, LLP
3900 Essex Lane, Ste. 390
Houston, Texas 77027
(713) 782-0000

B.     DEFENDANTS/APPELLEES:

Shell Oil Company

Shell Oil Company is an indirect, wholly owned subsidiary of Royal Dutch Shell plc, a publicly held Dutch company.

i

Chevron U.S.A. Inc.

Chevron U.S.A. Inc. was incorporated in Pennsylvania on August 9, 1922 as Gulf Oil Corporation of Pennsylvania. Its name was changed to Gulf Oil Corporation on May 5, 1936. On July 1, 1985, Chevron U.S.A. Inc., a California corporation, merged into Gulf Oil Corporation, and Gulf Oil Corporation changed its name to Chevron U.S.A. Inc. Chevron U.S.A. Inc. is an indirect, wholly owned subsidiary of Chevron Corporation.

Texaco Inc.

Texaco Inc. is an indirect, wholly owned subsidiary of Chevron Corporation.

Macey Reasoner Stokes
Amy Pharr Hefley
Baker Botts L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1234
(214) 229-7869 (fax)
macey.stokes@bakerbotts.com
amy.hefley@bakerbotts.com

Lauren Tanner Bradley
Baker Botts L.L.P.
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
(512) 322-2500
(512) 322-2501 (fax)
lauren.bradley@bakerbotts.com

Robert Scott
Marquel S. Jordan
Blank Rome LLP
717 Texas Avenue, Suite 1400
Houston, TX 77002

Charles Stanton Perry
Rhonda R. Caviedes
Rebecca Z. Hammerbeck
Meredith Allison Welch
Reed Smith, LLP
811 Main Street, Suite 1700
Houston, Texas 77002

Tim Gray
Lea Ann Smith
Forman Perry Watkins Krutz & Tardy LLP
701 Pydras Street, Suite 4350
New Orleans, LA 70139

S. Suzanne Mahoney
Nichole M. Gray
Johnson Gray McNamara, LLC
650 Poydras Street, Suite 1201
New Orleans, Louisiana 70130

*/s/ Lauren Tanner Bradley*
Lauren Tanner Bradley
*Counsel for Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

This Court can affirm the district court's judgment without oral argument. Contrary to plaintiff-appellant's contentions, this appeal does not present "an important issue concerning the boundaries of district courts' and trier-of-facts' respective roles in assessing expert testimony."  In a series of thorough, well-reasoned opinions that are consistent with this Court's well-settled precedent, the district court appropriately exercised its discretion to exclude unreliable expert opinions and properly granted summary judgment in defendants-appellees' favor because plaintiff-appellant could not prove causation.  Oral argument is therefore not required.  If the Court grants the request for oral argument, however, defendants-appellees wish to participate.

# TABLE OF CONTENTS

**Page**

ISSUES PRESENTED..................................................................................1

INTRODUCTION ......................................................................................2

STATEMENT OF THE CASE....................................................................4

    I.    The scientific literature establishes the lack of any reliable causal association between gasoline exposure and AML. ...................4

    II.    Mrs. Burst attempts to support her claim that *gasoline* exposure can cause AML with expert testimony on the association between *benzene* and AML and other diseases....................................6

    III.    The district court excludes Mrs. Burst's experts' testimony and grants summary judgment based on insufficient evidence of general causation. ...............................................................................10

SUMMARY OF THE ARGUMENT ........................................................14

STANDARD OF REVIEW ......................................................................17

ARGUMENT AND AUTHORITIES......................................................19

    I.    The district court correctly held that Mrs. Burst failed to carry her burden to show that gasoline, as opposed to pure benzene, can cause AML...................................................................................19

    II.    The district court acted well within its discretion in excluding Mrs. Burst's general causation experts and properly granted summary judgment. ...........................................................................25

        A.    The district court did not manifestly err in excluding Infante's testimony....................................................................25

            1.    The district court properly analyzed the reliability of Infante's epidemiological studies...............................26

            2.    Infante's studies do not reliably support his general causation opinion. .........................................................29

3.    The secondary literature does not reliably support Infante's general causation opinion.................................34

4.    Mr. Burst's chromosomal damage does not render Infante's opinion reliable...............................36

B.    The district court did not manifestly err in excluding Harrison's testimony. ................................37

III.   In the alternative, the district court's summary judgment should be affirmed because Mrs. Burst has offered no reliable evidence of specific causation. ..........................................40

CONCLUSION ..................................................................46

CERTIFICATE OF SERVICE ..............................................48

CERTIFICATE OF COMPLIANCE.......................................49

APPENDIX A....................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant:small-caps">CASES</span>

*Allen v. Pa. Eng'g Corp.*,
  102 F.3d 194 (5th Cir. 1996) .................................. 23, 26, 27, 29, 32, 34, 35, 41

*Baker v. Chevron USA, Inc.*,
  680 F. Supp. 2d 865 (2010), *aff'd*, 533 F. App'x 509 (6th Cir.
  2013) ...........................................................................................................35

*Benkwith v. Matrixx Initiatives, Inc.*,
  467 F. Supp. 2d 1316 (M.D. Ala. 2006)...........................................................21

*Boyd v. State Farm Ins. Cos.*,
  158 F.3d 326 (5th Cir. 1998) ...................................................................3, 17, 25

*Brock v. Merrell Dow Pharm., Inc.*,
  874 F.2d 307 (5th Cir. 1989) .......................................................................27, 32

*Burleson v. Tex. Dep't of Criminal Justice*,
  393 F.3d 577 (5th Cir. 2004) .......................................................................27, 32

*Castellow v. Chevron USA*,
  97 F. Supp. 2d 780 (S.D. Tex. 2000)............................................................20, 22

*Chambers v. Exxon Corp.*,
  81 F. Supp. 2d 661 (M.D. La. 2000), *aff'd*, 247 F.3d 240 (5th Cir.
  2001) ...................................................................................................7, 27, 28

*Curtis v. M&S Petroleum, Inc.*,
  174 F.3d 661 (5th Cir. 1999) .......................................................................23, 24

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)............................................................12, 17, 18, 24, 35

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)........................................................................17, 26, 32

*Glastetter v. Novartis Pharm. Corp.*,
  252 F.3d 986 (8th Cir. 2001) ............................................................................21

*Henricksen v. ConocoPhillips Co.*,
  605 F. Supp. 2d 1142 (E.D. Wash. 2009)............ 8, 20, 22, 24, 28, 32, 33, 36, 37

*In re TMI Litig.*,
  193 F.3d 613 (3d Cir. 1999) ................................................................39

*Johnson v. Arkema, Inc.*,
  685 F.3d 452 (5th Cir. 2012) .............................................................35

*Knight v. Kirby Inland Marine Inc.*,
  482 F.3d 347 (5th Cir. 2007) ............................................. 17, 18, 19, 26, 28, 40

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)...............................................................................17, 18

*LeBlanc v. Chevron USA, Inc.*,
  396 F. App'x 94 (5th Cir. 2010) ......................................... 18, 26, 27, 31, 32, 35

*Lightfoot v. Hartford Fire Ins. Co.*,
  No. Civ. A. 07–4833, 2011 WL 39010 (E.D. La. Jan.4, 2011) (not
  designated for publication) ...................................................................39

*Little Earth of the United Tribes, Inc. v. U.S. Dep't of Hous. & Urban*
  *Dev.*,
  807 F.2d 1433 (8th Cir. 1986) ...........................................................41

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) ...................................................21, 41

*Moore v. Ashland Chem. Inc.*,
  151 F.3d 269 (5th Cir. 1998) ...........................................................29, 36

*Mooring Capital Fund, LLC v. Phoenix Cent., Inc.*,
  No. CIV-06-0006-HE, 2009 WL 4263359 (W.D. Okla. Feb. 12,
  2009) (not designated for publication) ........................................38, 39

*Munoz v. Orr*,
  200 F.3d 291 (5th Cir. 2000) ...........................................................17

*Parker v. Mobil Oil Corp.*,
  857 N.E.2d 1114 (N.Y. 2006)................................................20, 22, 35

*Rider v. Sandoz Pharm. Corp.*,
   295 F.3d 1194 (11th Cir. 2002) ........................................................21

*Rogers v. Bromac Title Servs., L.L.C.*,
   755 F.3d 347 (5th Cir 2014) .............................................................40

*Royal Ins. Co. of Am. v. Quinn–L Capital Corp.*,
   960 F.2d 1286 (5th Cir. 1992) ..........................................................41

*Tiblier v. Dlabal*,
   743 F.3d 1004 (5th Cir. 2014) ..........................................................40

*TK-7 Corp. v. Estate of Barbouti*,
   993 F.2d 722 (10th Cir. 1993) ..........................................................39

## OTHER AUTHORITIES

FED. R. EVID. 703 ............................................................................38, 39

Michael D. Green et al., *Reference Guide on Epidemiology*, in
   REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 333, 385 (2d ed.
   2000) ..........................................................................................28, 41

Rushton, L., et al., *Acute Myeloid and Chronic Lymphoid Leukemias
   and Low-Level Benzene Among Petroleum Workers* .........................30

Schnatter, A., et al., *Myelodysplastic Sundrome and Benzene
   Exposure Among Petroleum Workers: An International Pooled
   Analysis* .........................................................................................30

**ISSUES PRESENTED**

(1)    Whether the district court abused its discretion in excluding the general-causation opinions of plaintiff-appellant's proposed experts and correctly granted summary judgment for defendants-appellees, when plaintiff offered no reliable scientific evidence that exposure to gasoline can cause the disease that killed Bernard Burst, Jr.

(2)    Whether the district court's summary judgment can be affirmed on the alternative ground that plaintiff-appellant offered no reliable evidence of specific causation, when she does not challenge the district court's exclusion of the exposure estimates offered by her experts and the record contains no other reliable evidence establishing the level of Mr. Burst's exposure to benzene in gasoline.

## INTRODUCTION

This appeal arises from the death of Bernard Burst, Jr., who died of acute myeloid leukemia ("AML") in December 2013 at age 71.  In January 2014, his wife, Appellant Yolande Burst, filed this product liability action against Shell Oil Company, Chevron U.S.A. Inc. (as successor to Gulf Oil Corporation), and Texaco Inc. (collectively, "Appellees").  She alleges that her husband's exposure to Appellees' gasoline while working as a gas station attendant and auto mechanic forty years earlier caused his AML.

Despite pleading a *gasoline* exposure case, Mrs. Burst attempted to prove causation with *benzene* exposure evidence.  Because exposure to pure benzene can cause AML, and because gasoline contains small amounts of benzene, Mrs. Burst theorized that gasoline can cause AML too.  But no reliable scientific evidence supports that theory.  No authoritative or regulatory body has categorized gasoline as a human carcinogen.  And the relevant scientific studies do not demonstrate that exposure to gasoline is causally associated with AML.

Notwithstanding the lack of reliable scientific evidence that gasoline exposure causes AML, Mrs. Burst's experts equated exposure to the benzene in gasoline with exposure to pure benzene and opined that Mr. Burst's exposure caused his AML.  The opinions of Mrs. Burst's experts were supported by made-up, extreme estimates of Mr. Burst's exposure levels, based on unreasonable

assumptions that were inconsistent with the factual record and that one of Mrs. Burst's own experts ultimately conceded were a "mistake." ROA.3859. Indeed, had these mistaken exposure levels actually occurred, Mr. Burst would have died from the acute effects of inhaling gasoline fumes decades before he was diagnosed with AML.

In a series of well-reasoned decisions, the district court, exercising its broad discretion under Federal Rule of Evidence 702, excluded these unreliable opinions of Mrs. Burst's experts. With no admissible evidence of general causation, the district court granted summary judgment for Appellees.

Mrs. Burst now faces a heavy burden on appeal. She does not dispute that if the district court properly excluded her experts, then it also properly granted summary judgment. *See* Br. 13. Thus, to prevail on appeal, Mrs. Burst must show that the district court's expert rulings were "manifestly erroneous." *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 331 (5th Cir. 1998). She has not come close to meeting that burden. Instead, she continues to rely on the same fallacies and record distortions properly rejected by the district court below. The district court's rulings excluding Mrs. Burst's experts and its grant of summary judgment for Appellees should therefore be affirmed.

## STATEMENT OF THE CASE

### I.    The scientific literature establishes the lack of any reliable causal association between gasoline exposure and AML.

AML is one of the most common types of leukemia in adults in the United States, with more than 12,000 new cases diagnosed each year. ROA.1827. AML is more common in adults age 65 and older, and the risk of contracting AML increases with age. ROA.7361, ROA.8608. There are various known causes of the disease, including cigarette smoking, chemotherapy, radiation exposure, and exposure to benzene. ROA.1827, ROA.1849, ROA.7361, ROA.8549, ROA.8630–31, ROA.8637, ROA.8899–900, ROA.8902. Other risk factors associated with developing AML include myriad underlying genetic syndromes, such as down syndrome, and preexisting blood disorders, including MDS, myeloproliferative neoplasms, pernicious anemia, and MGUS. ROA.1847–49, ROA.7361, ROA.8891–92, ROA.8895, ROA.8900–02, ROA.8903. Yet, the majority of AML cases—as many as 80-90%—have no known cause. ROA.1827, ROA.1849, ROA.8629, ROA.8897–98.

No one disputes that scientific studies have demonstrated a causal relationship between occupational exposure to certain levels of benzene exposure and the occurrence of some subtypes of AML. *E.g.*, ROA.8043. But there is no uniform agreement in the scientific community as to what level of benzene exposure is necessary for AML to develop. *E.g.*, ROA.1829. Small amounts of

benzene exist everywhere—in air, water, soil, and food—and humans are exposed to benzene on a daily basis. *See* ROA.1829, ROA.8822–23.

It is also undisputed that benzene is only one small component of the compound mixture of gasoline, which is a highly refined petroleum product that contains as many as 150 distinct hydrocarbon compounds and other additives. ROA.1823, ROA.8735. As discussed in more detail below, the scientific literature recognizes that there is no reliable scientific data showing that the amounts of benzene found in gasoline are sufficient to make gasoline a human carcinogen. *See infra* pp. 29–33. And no recognized regulatory authority or advisory body has classified gasoline as a human carcinogen or reliably associated gasoline exposure to AML. *See* ROA.8043. Instead, as expert agencies have concluded, "[t]here is *inadequate evidence* for the carcinogenicity in humans of gasoline." ROA.8043 (quoting IARC, Monographs on the Evaluation of Carcinogenic Risks to Humans, Vol. 45, Occupational Exposures in Petroleum Refining; Crude Oil and Major Petroleum Fuels (1989) (emphasis in original)); *see also* ROA.8044 ("[T]here is no conclusive evidence to support or refute the carcinogenic potential of gasoline in humans or animals based on the carcinogenicity of one of its components, benzene." (quoting ATSDR, Toxicological Profile for Gasoline (1995)).

**II.    Mrs. Burst attempts to support her claim that *gasoline* exposure can cause AML with expert testimony on the association between *benzene* and AML and other diseases.**

Between 1958 and 1971, Mr. Burst worked intermittently as a gasoline station attendant at various Shell, Texaco, and Gulf Oil gasoline stations in the New Orleans area.  ROA.21.  According to Mrs. Burst's complaint, Mr. Burst "pumped gas, gauged gasoline storage tanks and performed various mechanic tasks such as cleaning, repairing, maintenance of automobiles, [and] washing parts with gasoline."  ROA.21.

Forty years later, in June 2013, physicians diagnosed Mr. Burst with AML.  ROA.296.  He had been previously diagnosed with other hematologic disorders— none of which is associated with benzene exposure, ROA.1844–45—including the hereditary illness pernicious anemia, the bone marrow condition monoclonal gammopathy of undetermined significance ("MGUS"), and a type of non-Hodgkin's lymphoma called Waldenstrom's macroglobulinemia.  ROA.1847, ROA.8889–94.    However, contrary to Mrs. Burst's bald assertions that myelodysplastic syndrome ("MDS") is a relevant disease in this case, *see, e.g.*, Br. 12, 53, 55, Mr. Burst had not been previously diagnosed with that illness.  *See* ROA.8896 ("Q. Did Mr. Burst have [MDS]?  A. No.");  ROA.8918 ("Q. Was Mr. Burst diagnosed with AML with MDS?  A. No.  He was diagnosed as AML

with myelodysplasia related changes."); *see also* ROA.306 (listing only AML on Mr. Burst's death certificate).

Six months after his AML diagnosis, Mr. Burst passed away from AML at the age of 71.  ROA.306.  Mrs. Burst then filed this lawsuit, alleging that her husband's AML resulted from exposure to benzene in gasoline while he worked as a gasoline station attendant and auto mechanic.  ROA.21–32.  There are no allegations, much less evidence, that Mr. Burst was ever exposed to pure benzene. ROA.2328.

To prove her case, Mrs. Burst was required to proffer admissible expert testimony establishing both general and specific causation.  That is, she needed to present reliable evidence that exposure to gasoline can cause AML generally, and that Mr. Burst's exposure to gasoline actually caused his AML.  In an attempt to carry this acknowledged burden, Mrs. Burst relied on four expert witnesses: (1) epidemiologist Dr. Peter F. Infante, (2) physician Dr. Robert Harrison, (3) industrial hygienist Mr. Richard L. Miller, and (4) meteorologist Dr. David L. Mitchell.

Peter Infante.  Infante routinely provides expert services to plaintiffs in benzene exposure and other toxic tort cases.  Courts have excluded his causation opinions as unreliable in at least two other cases.  *See Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661 (M.D. La. 2000), *aff'd*, 247 F.3d 240 (5th Cir. 2001);

*Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142 (E.D. Wash. 2009). In this case, Infante opined on the general causation question of "whether or not occupational exposure to benzene is a cause of [MDS] and [AML]." ROA.4989. Relying on "the epidemiological and toxicological literature, plus internal industry documents, related to benzene exposure and risk of developing blood diseases," ROA.4989, Infante opined that "exposure to very low level benzene from gasoline can cause damage to the DNA of bone marrow cells as well as AML," and that "[t]he data related to gasoline exposure and risk of AML are consistent with the epidemiological data on benzene exposure that demonstrate an elevated risk of MDS/AML . . . ." ROA.5067.

Infante also offered his view on the specific causation question of "whether or not [Mr. Burst's] occupational benzene exposure resulting from his employment at gasoline filling stations may have been a significant contributing factor to his development of AML." ROA.4989. Based on his review of Mrs. Burst's other experts' reports and his own exposure estimates, ROA.4992, Infante concluded that Mr. Burst's "occupational exposures to benzene while employed as a gasoline service station attendant . . . were a significant contributing factor and the most likely cause of his development and death from AML." ROA.5069.

<u>Robert Harrison</u>. Like Infante, Harrison opined that benzene exposure causes AML, purportedly based on a review of "the epidemiological studies on

benzene and human cancer," the studies cited by the International Agency for Research on Cancer ("IARC"),[1] and his "own experience as an occupational and environmental specialist." ROA.7924. He also opined that "Mr. Burst's AML was caused by his occupational exposure to benzene while working at Shell, Gulf and Texaco stations" based on his review of Mrs. Burst's other experts' reports and Mr. Burst's medical records. ROA.7363.

Richard Miller. Miller estimated Mr. Burst's occupational exposure to benzene in gasoline. ROA.3797. To create that estimate, Miller attempted to reconstruct Mr. Burst's work duties during a one-year period between 1966 and 1968 when he worked at a Gulf Oil gas station. ROA.3794–3833. Miller based that reconstruction on testimony from Mrs. Burst, as well as from one of Mr. Burst's co-workers and from the former owner of the Gulf Oil gas station. ROA.3794–3833. Concluding that Mr. Burst experienced inhalation exposure and dermal exposure to gasoline from a variety of sources, Miller attempted to estimate Mr. Burst's exposure to benzene in gasoline. As Miller later acknowledged, his methodology was infected with serious flaws; it was also based on implausible assumptions that were inconsistent with the record facts. *See infra* pp.41–43.

---

[1] It is telling that Harrison relied only on the IARC benzene monograph and did not even review the IARC gasoline monograph. ROA.4757–62.

David Mitchell.   Mitchell offered general testimony about air dispersion modeling results for benzene emissions from gasoline and other hydrocarbon products at service stations where Mr. Burst worked.  ROA.6864.  Mitchell did not calculate an estimated cumulative dose of benzene exposure from gasoline sustained by Mr. Burst.  ROA.4068–69.  Nor did Mitchell rely on any evidence of Mr. Burst's exposure to gasoline while working at any Shell Oil gas station. ROA.3016–19.

### III.   The district court excludes Mrs. Burst's experts' testimony and grants summary judgment based on insufficient evidence of general causation.

Three months after filing her complaint, Mrs. Burst moved for partial summary judgment on the issue of general causation, framing the question as "whether *benzene* can cause AML in humans."  ROA.2331 (emphasis added).  "At oral argument, [Mrs. Burst]'s counsel clarified that [Mrs. Burst] is alleging that her husband was exposed to gasoline containing benzene, not to pure benzene." ROA.2328.  In light of that concession and the arguments presented by the parties, the district court concluded that "the proper general causation question in this case is whether exposure to gasoline containing benzene can cause [AML], not whether exposure simply to benzene can cause [AML]."  ROA.2332.

Notwithstanding the district court's framing of the general causation question, Infante and Harrison submitted expert reports that focused on whether benzene exposure causes AML.  ROA.4989 ("You asked me to provide . . . an

10

opinion as to whether or not occupational exposure to benzene is a cause of . . . [AML].”); ROA.7363 (“[T]here is substantial evidence in the medical and scientific literature that demonstrates that benzene exposure causes AML.”). Because those opinions did not address the “proper general causation question in this case,” ROA.2332—whether exposure to gasoline can cause AML—and are not supported by the substantial body of scientific literature related to the health effects of gasoline exposure, Appellees moved to exclude them.  ROA.4730–31.

Appellees also moved to exclude Miller’s opinions regarding Mr. Burst’s purported levels of exposure to benzene from gasoline.  ROA.3786–87.  Miller’s opinions were unreliable because, among other things, (1) if Miller’s inhalation dose estimate were correct, Mr. Burst would have died not some forty years after exposure, as Burst suggests, but instead almost immediately from acute overexposure to gasoline fumes; (2) Miller’s inhalation dose estimate ignored relevant data from over 14 peer-reviewed publications; and (3) his dermal dose calculations failed to account for evaporation and the serious damage to Mr. Burst’s skin that likely would have resulted had his hands been wet with gasoline for the up to 10.5 hours per day assumed by Miller.  ROA.4091–92.

Appellees similarly moved to exclude Mitchell’s atmospheric dispersion modeling and benzene emission opinions, challenging both their reliability and their relevance in light of Mitchell’s admission that he did not estimate a

cumulative dose of benzene exposure from gasoline for Mr. Burst.  ROA.3786–87, 4068–69.  In addition to these grounds, Shell moved to strike Mitchell's testimony on the ground that he did not rely on any evidence concerning Mr. Burst's exposure to gasoline while working at a Shell gas station.  ROA.3016–19.

In three separate, well-reasoned opinions, the district court granted Appellees' motions and excluded Infante, Harrison, and Miller as unreliable. ROA.8024–68 (excluding Infante); ROA.7916–28 (excluding Harrison); ROA.7015–50 (excluding Miller).[2]

The district court excluded Infante's testimony after a two-day *Daubert* hearing and an "extensive review of the parties' briefings and submissions, Dr. Infante's report and testimony, and the relevant scientific literature."  ROA.8042. In a 45-page opinion, the court determined that "Infante's general causation opinion is based on an unreliable methodology," ROA.8024, because "Infante relied on a universe of divergent studies that either did not examine the substance at issue, did not examine the disease at issue, or did not exhibit statistically significant results."  ROA.8063–64.  The court also found that Infante "exhibited a willingness to ignore or disregard contrary results," ROA.8064, "cherry-picked" or "manipulated" data to achieve desired outcomes, and "fail[ed] to provide a

---

[2]    The district court did not reach the motions to exclude Mitchell before granting summary judgment.

meaningful analysis," ROA.8047, despite the existence of conflicting studies and "the paucity of scientific literature supporting his conclusion." ROA.8064–65.

The district court excluded Harrison's general causation opinion as "unreliable" because he cited "only benzene-specific scientific literature," ROA.7925–26, and "made no attempt to demonstrate why benzene-specific studies can reliably support the conclusion that gasoline can cause AML." ROA.7925. Absent such an explanation, the court found that "Harrison's methodology leaves too great an analytical gap between the data and the opinion proffered," ROA.7926 (internal quotation marks omitted), and amounts to "wholly conclusory *ipse dixit*." ROA.7927. Harrison's reliance on Infante's report did nothing to salvage Harrison's opinions because instead of analyzing the studies and assessing the validity of Infante's conclusions, Harrison merely adopted Infante's opinions "wholesale." ROA.7928 (internal quotation marks omitted).

The district court also excluded Miller's opinions about Mr. Burst's benzene exposure through gasoline as "unreliable," ROA.7050, and "result driven," ROA.7037. The court held that his opinions were based on "unreasonable and often unfounded assumptions," ROA.7050, accounted for certain conditions only when it was helpful to do so while ignoring those same conditions when it was harmful, and were only selectively based on scientific literature. ROA.7049–50. "Cumulatively, Miller's methodology produces an exposure assessment that is

likely artificially high and that is not reasonably based on the factual record but instead on speculation." ROA.7050.

After excluding Mrs. Burst's experts, the district court granted Appellees' motion for summary judgment, recognizing that Mrs. Burst "proffers no admissible evidence on general causation," ROA.8338, and, thus, "may not present evidence on specific causation." ROA.8338. The court did not reach Appellees' alternative argument that summary judgment was also appropriate because Mrs. Burst had failed to adduce any reliable, admissible expert evidence sufficient to establish specific causation. ROA.7051–53.

On appeal, Mrs. Burst challenges the district court's rulings excluding Infante's and Harrison's testimony and the resulting summary judgment order. However, she does not appeal the district court's ruling excluding Miller. Nor does she address the specific causation grounds raised in Appellees' summary judgment motion. *See* Br. 10 ("[T]his appeal is limited to general causation.").

## SUMMARY OF THE ARGUMENT

The district court properly rejected Mrs. Burst's unsupported position that gasoline should be assumed to cause AML merely because it contains small amounts of benzene. Mrs. Burst bore the burden of coming forward with reliable scientific evidence establishing that gasoline itself can cause AML. The district court's conclusion that she failed to carry that burden is consistent with a long line

of decisions in which courts have excluded experts—including Mrs. Burst's own expert—upon recognizing that the relevant scientific and medical literature does not support the conclusion that occupational exposure to gasoline containing benzene is capable of causing AML. Gasoline and benzene are not the same product, and it is well established in the scientific literature that even minor changes in chemical composition can change a product's toxicity. The cases upon which Mrs. Burst relies are readily distinguished, and the fact that she is the master of her own complaint does not excuse her from the basic requirements of establishing general causation with reliable expert evidence.

Mrs. Burst's attempts to argue that her experts established a reliable connection between gasoline exposure and AML are unavailing. Both of her general causation experts—Infante and Harrison—based their opinions on benzene-specific literature and the invalid view that gasoline can be assumed to be a human carcinogen merely because it contains benzene. And while Infante also cited certain epidemiological studies, he conceded that most contained no statistically significant findings, and he manipulated and mischaracterized the rest. As the district court correctly concluded, the "universe of divergent studies [cited by Infante] . . . either did not examine the substance at issue, did not examine the disease at issue, or did not exhibit statistically significant results." ROA.8063–64. Nor were Infante's manipulations of and extrapolations from the studies consistent

with the conclusions of the studies' own authors.  ROA.8055–63.  Mrs. Burst does not address these criticisms in her brief.  Instead, she relies on prescriptive statements by administrative and regulatory agencies, none of which states that gasoline can cause AML, as well as statements in other documents that are not scientific evidence.  Similarly, the scientific literature does not support Infante's speculation regarding Mr. Burst's chromosomal aberrations as a reliable indicator that gasoline exposure caused his AML.  For all of these reasons, the district court properly excluded Infante's opinion.

Harrison's general causation conclusions are similarly unreliable.  He failed to consider *any* gasoline-specific studies.  And he could not salvage his opinion by adopting Infante's unreliable opinion wholesale, without any independent analysis or assessment of the validity of that opinion.

Because the district court properly excluded the general causation opinions of Mrs. Burst's experts, this Court should affirm the district court's summary judgment on this ground alone.  If it does not, however, the Court should affirm on the alternative ground that Mrs. Burst cannot establish specific causation as a matter of law.  The district court correctly excluded Miller's unreliable estimate of Mr. Burst's cumulative exposure to benzene from gasoline—a ruling that Mrs. Burst has not appealed.  Moreover, as Appellees established in their summary judgment motion, neither Infante nor Harrison had any other reliable basis for their

specific causation opinions. Without reliable evidence of the dose of benzene to which Mr. Burst was exposed, Mrs. Burst cannot establish that Appellees' gasoline caused Mr. Burst's AML.

**STANDARD OF REVIEW**

This Court reviews a district court's exclusion of expert testimony under Rule 702 for an abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39 (1997). That review is highly deferential: "[T]he trial court has broad discretion to rule on the admissibility of the expert's evidence and its ruling must be sustained unless *manifestly erroneous*." *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 331 (5th Cir. 1998) (emphasis added). Moreover, even "[i]f this court finds an abuse of discretion in admitting or excluding [the] evidence, we review the error under the harmless error doctrine, affirming the judgment, unless the ruling affected substantial rights of the complaining party." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (internal quotation marks omitted). Only after defining the evidence that is properly in the summary judgment record does the Court conduct a de novo review of the district court's summary judgment. *Munoz v. Orr*, 200 F.3d 291, 299–300 (5th Cir. 2000).

Rule 702 "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (ellipsis in original) (quoting *Daubert v.*

*Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).  "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'  Relevance depends upon 'whether [that] reasoning or methodology properly can be applied to the facts in issue." *Knight*, 482 F.3d at 352 (alteration in original) (internal citations omitted) (quoting *Daubert*, 509 U.S. at 592–93).  Although Mrs. Burst selectively quotes *Kumho Tire* to argue that the district court must admit testimony that falls "within the range where experts might reasonably differ," even if the evidence is "shaky," Br.17 (quotation marks omitted), this Court has rejected precisely that argument as a mischaracterization of *Kumho Tire*. *LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 97 n.4 (5th Cir. 2010).

"[T]here is a two-step process in examining the admissibility of causation evidence in toxic tort cases." *Knight*, 482 F.3d at 351.  "First, the district court must determine whether there is general causation." *Id.*  "General causation is whether a substance is capable of causing a particular injury or condition in the general population . . . ." *Id.*  "Second, if [the district court] concludes that there is admissible general-causation evidence, the district court must determine whether there is admissible specific-causation evidence." *Id.*  "[S]pecific causation is whether a substance caused a particular individual's injury." *Id.*  "Evidence

concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence." *Id.*

## ARGUMENT AND AUTHORITIES

**I.    The district court correctly held that Mrs. Burst failed to carry her burden to show that gasoline, as opposed to pure benzene, can cause AML.**

Mrs. Burst spends a large part of her brief attacking an argument that no one disputes—that benzene, at certain levels of exposure, can cause AML. *See* Br. 20–25. But that is not the issue in this case. As the district court recognized, "[t]he parties do not dispute" that "benzene can cause AML." ROA.8043; *cf.* Br. 21 (arguing inaccurately that the district court "concluded that the medical and scientific literature does not show that benzene exposure causes AML"). Rather, the sole question is whether Mrs. Burst's experts had any valid scientific basis for opining that exposure to *gasoline* containing small amounts of benzene can cause AML. ROA.8042 ("The question here . . . is whether exposure to gasoline containing benzene can cause AML."); ROA.2332 ("[T]he proper general causation question in this case is whether exposure to gasoline containing benzene can cause [AML], not whether exposure simply to benzene can cause [AML].").

Mrs. Burst and her experts refused to address that critical issue, insisting instead that "benzene is a carcinogen, and benzene is in gasoline." Br. 29. But it does not follow that gasoline is a human carcinogen. If, for instance, a scientist

wants to reach reliable and valid conclusions about the health effects of drinking water, she would study the actual water we drink. She would not rely solely on studies examining pure hydrogen, oxygen, or other substances often found in water. Nor would she reliably use those studies to reach general conclusions about water's toxicology.

Not surprisingly, courts have rejected Mrs. Burst's extreme position, recognizing that in cases involving exposure to gasoline, proving general causation requires much more than simply noting that gasoline has benzene in it. *See, e.g.*, *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 796 (S.D. Tex. 2000) ("Plaintiffs here have not shown that the relevant scientific or medical literature supports the conclusion that workers exposed to benzene, as a component of gasoline, face a statistically significant risk of an increase in the rate of AML."); *Parker v. Mobil Oil Corp.*, 857 N.E.2d 1114, 1122 (N.Y. 2006) ("Key to this litigation is the relationship, if any, between exposure to *gasoline* containing benzene as a component and AML.") (emphasis in original).

In *Henricksen v. ConocoPhillips Co.*, for example, a former gasoline tanker truck driver sued a gasoline company, alleging that his occupational exposure to benzene and benzene-containing products, including gasoline, caused his AML. 605 F. Supp. 2d at 1148, 1149. Infante offered the same general causation opinion that he offered in this case—that benzene can cause AML, and therefore gasoline

also must be capable of causing AML because it contains benzene. *Id.* at 1168–77. The court saw through that attempt to circumvent the requirement to prove general causation. Noting that the truck driver had been exposed to gasoline, not pure benzene, the district court excluded Infante's opinion as unreliable. *Id.* at 1156, 1176–77. The court explained that, while "evaluations of both gasoline and its toxic component benzene are obviously relevant," it could "not simply presume that the qualitative toxic and carcinogenic effects of benzene from *any source* are the same." *Id.* at 1156 (emphasis in original).

This makes sense. "Benzene and gasoline . . . are not one in the same product." *Id.* Rather, benzene is only a very small component of gasoline and, as a number of courts have explained, "[e]ven minor deviations in chemical structure can radically change a particular substance's properties and propensities." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1201 (11th Cir. 2002) (alteration in original) (quoting *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 990 (8th Cir. 2001)); *accord McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1246 (11th Cir. 2005); *see also Benkwith v. Matrixx Initiatives, Inc.*, 467 F. Supp. 2d 1316, 1327 (M.D. Ala. 2006) ("[C]areful scrutiny is required when an expert attempts to demonstrate general causation through analogy to a different, though similar, substance."). Such "small differences in chemical structure can sometimes make very large differences in the type of toxic response that is produced." *McClain*, 401 F.3d at

1246 (quoting David Eaton, *Scientific Judgment and Toxic Torts–A Primer in Toxicology for Judges and Lawyers*, 12 J.L. & POL'Y 1, 10–11 (2003)).

As the district court correctly noted, "there is a paucity of scientific literature supporting [the] opinion that gasoline can cause AML." ROA.8065 (citing *Henricksen*, 605 F. Supp. 2d at 1176; *Castellow*, 97 F. Supp. 2d at 796; *Parker*, 857 N.E.2d at 1122). As those courts have recognized*,* "no significant association has been found between gasoline exposure and AML," *Parker*, 857 N.E.2d at 1122, and no relevant studies "have concluded that gasoline has the same toxic effect as benzene," or "that the benzene component of gasoline is capable of *causing* AML." *Henricksen*, 605 F. Supp. 2d at 1176 (emphasis in original). There is no reliable evidence that "workers exposed to benzene, as a component of gasoline, face a statistically significant risk of an increase in the rate of AML." *Castellow*, 97 F. Supp.2d at 796.

Mrs. Burst ignores these relevant decisions. And she cites no case holding that studies concerning only a small component of a product, standing alone, are sufficient to support a general causation conclusion about the product itself, either in the benzene context or any other context. The cases that she does cite are inapposite and readily distinguished:

- *Clark v. Kellogg Brown & Root L.L.C.* was an appeal from a bench trial in a Jones Act case in which the plaintiff, a barge worker, was exposed to pure benzene, not gasoline. 414 F. App'x 623, 624–25 (5th Cir. 2011). The case involved the "featherweight" producing

causation standard unique to Jones Act cases, and, notably, KBR did not appeal the district court's finding of general causation. *Id.* at 626, 627 n.5.

• *Warren v. Sabine Towing & Transportation Co.* involved exposure to both gasoline and pure benzene and employed a deferential standard of review favoring the trial court's decision to admit the challenged evidence at the trial on the merits. 831 So. 2d 517, 521–22 (La. Ct. App. 2002).

• *Milward v. Acuity Specialty Products Group, Inc.* involved a refrigeration technician with acute promyelocytic leukemia ("APL") who did not allege occupational exposure to gasoline. 639 F.3d 11, 13–14 (1st Cir. 2011). Moreover, the First Circuit applied a "weight of the evidence" standard, *id.* at 17, which this Court has expressly rejected. *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996).

• *Kinder Morgan Energy Partners, L.P. v. Claytor*, involved a terminal worker diagnosed with MDS and was reviewed under a different, "less rigid expert rule" dictated by Nevada state law. Nos. 60131 & 60667, 2014 WL 7187204, at *1–2 (Nev. Dec. 16, 2014).

The only case cited by Mrs. Burst in which studies concerning benzene were found sufficient to support a general causation conclusion about a benzene-containing product itself—*Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661 (5th Cir. 1999)—is also readily distinguished. *Curtis* concerned not gasoline, but a co-product of a manufacturing process known as heavy aromatic distillate ("HAD"). *Id.* at 665. The record showed that HAD is made up of a whopping 25–35% benzene. *Id.* A product that is more than a quarter pure benzene stands in stark contrast to gasoline, which is no more than 1–2% benzene. ROA.7157. Furthermore, unlike Mrs. Burst's experts, the *Curtis* expert had actual,

contemporaneous air monitoring data that showed benzene levels exceeding OSHA's permissible benzene exposure level by a factor of at least ten. 174 F.3d at 666–67, 671. These difference are significant because Infante made no effort to demonstrate why benzene-specific studies can reliably support his conclusion that the small amount of benzene in gasoline can cause AML. *See Henricksen*, 605 F. Supp. 2d at 1156 ("If it is possible to extrapolate from studies of benzene or other benzene-containing products conclusions regarding gasoline, then it will be incumbent upon [plaintiff] to explain and demonstrate why the extrapolation is scientifically proper.").

Tacitly acknowledging the weakness of her position, Mrs. Burst insists that she "is the master of the Complaint," and that her bare allegation that benzene exposure caused Mr. Burst's AML should dictate the general causation analysis. Br. 23. But that novel argument has no support in either the record or the law. Mrs. Burst cites no case suggesting that a party's artful pleading dictates the scope of a court's gatekeeping duties under *Daubert*. Even still, far from ignoring the actual allegations in the complaint, Br. 23, the district court correctly recognized— as Mrs. Burst's own counsel admitted—that the complaint alleges Mr. Burst "was exposed to gasoline containing benzene, not to pure benzene" or any other substance containing benzene. ROA.2328.

**II.    The district court acted well within its discretion in excluding Mrs. Burst's general causation experts and properly granted summary judgment.**

As noted above, to prevail on her appeal, Mrs. Burst must demonstrate that the district court's rulings excluding her general causation experts were manifestly erroneous. *Boyd*, 158 F.3d at 331. She has not come close to carrying that burden. The district court properly excluded the general causation testimony of both Infante and Harrison because neither provided any reliable scientific basis for concluding that the benzene in gasoline can cause AML.

**A.    The district court did not manifestly err in excluding Infante's testimony.**

Mrs. Burst does not dispute that Infante's general causation opinion is based on the premise that gasoline causes AML because it contains 1–2% benzene. *See* ROA.1823; ROA.7158 (Infante's assumption that benzene content of gasoline pumped by Mr. Burst was on average 2%). She nonetheless attempts to resuscitate his opinion by arguing that the "weight of the evidence"—certain gasoline studies, statements made in non-scientific literature, and the fact that Mr. Burst suffered chromosomal damage—establish a reliable basis for concluding that gasoline is capable of causing AML and specifically caused Mr. Burst's AML. *See* Br. 26. Even putting aside that this Court rejected the "weight of the evidence"

methodology almost two decades ago, *Allen*, 102 F.3d at 198.[3]    Mrs. Burst's arguments distort the record and do not withstand scrutiny.

### 1.    The district court properly analyzed the reliability of Infante's epidemiological studies.

As a threshold matter, Mrs. Burst's suggestion that the district court invaded the province of the jury by examining the individual studies cited by Infante, Br. 17–19, finds no support in the law.  On the contrary, this Court has made clear that "[d]istrict courts must carefully analyze the studies on which experts rely for their opinions before admitting their testimony," *Knight*, 482 F.3d at 355, and should not admit opinion evidence that is "connected to existing data only by the *ipse dixit* of the expert."  *Joiner*, 522 U.S. at 146.  Where the "underlying studies cannot support the witness's conclusions," expert testimony is properly excluded as unreliable.  *LeBlanc*, 396 F. App'x at 98.

As the district court correctly recognized, to be reliable, Infante's studies had to be statistically significant; otherwise, any results could be due to chance.  *See, e.g.*, *Joiner*, 522 U.S. at 145 (holding that a study showing a statistically *in*significant increase in disease incidence following exposure to an alleged causal agent can properly be rejected as a foundation for an expert's opinion); *LeBlanc*, 396 F. App'x at 99 (listing the fact that "studies do not represent statistically

---

[3]    Indeed, a "weight of the evidence" approach, which is focused on disease prevention, does not make sense in the legal context, which requires a higher threshold of proof before imposing liability on an alleged tortfeasor.  *See infra* pp. 34–36.

significant results" among the "common deficiencies" that "support a district court's exclusion of expert testimony"); *Allen*, 102 F.3d at 197 (rejecting as unreliable studies that were not statistically significant and were merely "suggestive" of a link); *Brock v. Merrell Dow Pharm., Inc.*, 874 F.2d 307, 311–13 (5th Cir. 1989) (discussing the importance of statistical significance and deeming the lack of statistically significant epidemiological proof "fatal to the [plaintiff's] case"); *Chambers*, 81 F. Supp. 2d at 664–65 (requiring that studies show statistically significant association between benzene and chronic myelogenous leukemia).[4] Studies that provide a mere suggestion or hypothetical possibility of a relationship are insufficient. *See Allen*, 102 F.3d at 197; *LeBlanc*, 396 F. App'x at 99.

The studies also must focus on Mr. Burst's specific disease, AML. *See, e.g.*, *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 585 (5th Cir. 2004) (affirming exclusion of expert as unreliable where "there are no epidemiological studies supporting a correlation between the suggested causative agent and the type of cancer experienced by the plaintiff"); *Allen*, 102 F.3d at 197 (holding that evidence suggesting a connection between ethylene oxide and lymphatic and hematopoietic cancers was "not probative on the causation of brain cancer");

---

[4]    A study is considered statistically significant only when the results are expressed with a 95% confidence interval that does not include the number 1.0. *See Brock*, 874 F.2d at 312.

*Chambers*, 81 F. Supp. 2d at 664 (rejecting attempt to prove association between benzene exposure and chronic myelogenous leukemia with studies regarding AML); *Henricksen*, 605 F. Supp. 2d at 1171–75 (calling into question the relevance of studies that did not study the specific disease at issue). A study that suggests an increased risk of leukemia generally, for example, does not reliably demonstrate an increased risk of AML specifically. *See Chambers*, 81 F. Supp. 2d at 664.

Likewise, a study that focuses on persons whose occupations or alleged exposures differ from Mr. Burst's does not provide reliable evidence of a gasoline station attendant's or auto mechanic's propensity to develop AML as a result of gasoline exposure. *See, e.g.*, *Knight*, 482 F.3d at 352–53 (deeming study regarding shipyard workers unreliable evidence of what caused tankerman's illness); *see also* Michael D. Green et al., *Reference Guide on Epidemiology*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 333, 385 (2d ed. 2000) [hereinafter, "REFERENCE GUIDE"] (explaining that plaintiff must be comparable to study participants for study to be used as evidence of causation). Moreover, studies that do not quantify the dose of benzene in gasoline to which the participants were exposed, or that examine doses different from Mr. Burst's exposure, cannot provide reliable evidence that benzene in gasoline causes AML at Mr. Burst's alleged dose. *See, e.g.*, *Knight*, 482 F.3d at 353 (deeming irrelevant study that did

not evaluate sufficiently similar exposure); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278–79 (5th Cir. 1998) (deeming unreliable expert's reliance on study involving toluene exposure where "the level and duration of the exposure was several times greater than [the plaintiff's] exposure"); *see also Allen*, 102 F.3d at 199 ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case.").

### 2. Infante's studies do not reliably support his general causation opinion.

Contrary to Mrs. Burst's assertions, *see* Br. 35–38, none of the 15 "studies specific to gasoline" relied on by Infante reliably supports the conclusion that gasoline can cause AML. *See* Appendix A (table showing key shortcomings of putative "gasoline" studies relied on by Infante). As the district court determined, the "universe of divergent studies [relied upon by Infante] . . . either did not examine the substance at issue, did not examine the disease at issue, or did not exhibit statistically significant results." ROA.8063–64. Mrs. Burst makes no effort to refute these criticisms, and in many cases, concedes that they exist.

First, the district court found that Infante cherry picked and manipulated the data from various studies on which he relied and reached conclusions different from those of the studies own authors. *See* ROA.8055–63. Mrs. Burst's brief attempts to rebut this conclusion by misrepresenting the studies. For example, she

asserts that "[o]f the 15 studies cited and reviewed, four demonstrate a statistically significant excess risk of AML."  Br. 35 (citing Wong et al. 1993, Sorahan et al. 2002; Schnatter et al. 2012; Rushton et al. 2014).  But that assertion conflicts with the conclusions of the Schnatter and Rushton studies' own authors.[5]  *See* Schnatter, A., et al., *Myelodysplastic Sundrome and Benzene Exposure Among Petroleum Workers: An International Pooled Analysis*, 104 J. NAT'L CANCER INST. 1724 (2012). ("Relatively low-level exposure to benzene experienced by petroleum distribution workers was associated with an increased risk of MDS, but not AML . . . ."); Rushton, L., et al., *Acute Myeloid and Chronic Lymphoid Leukemias and Low-Level Benzene Among Petroleum Workers*, 110 BR J CANCER 783 (2014) ("While some patterns among terminal workers, who tend to have relatively high benzene exposure, suggest a relationship between AML and benzene, the overall evidence does not persuasively demonstrate a risk between benzene and AML."). And the authors of the Wong and Sorahan studies did not observe statistically significant results at all.    ROA.7504;  ROA.8056;  ROA.8060;  ROA.8513–14; ROA.8670.  To create statistically significant results, Infante adjusted the data in these studies without providing any indication as to how he made the adjustments or to what extent, and even though the adjustments were often directly contrary to

---

[5]    Additionally, these studies showed statistically significant results for AML only for tanker truck drivers, ROA.8528–29, ROA.7700, without any elaboration as to the substances to which the drivers were exposed.  ROA.8051.

the judgments made by the studies' own authors.  *See* ROA.5060–61; ROA.8513–14; ROA.8774.  The district court acted well within its discretion in finding that Infante's unexplained, "after-the-fact manipulations of published data" rendered his method unreliable.  *See* ROA.8063.

Second, several of Infante's studies either do not isolate gasoline exposure or do not provide exposure metrics.  ROA.8047-8051 (Schwartz 1987; Hunting, et al. 1995; Lindquist et al. 1991; Sathiakamur, et al. 1995; Terry, P., et al. 2005; Schnatter, A., et al. 1993; Schnatter, A., et al. 2012); *see* ROA.8673–74 (Wong et al. 2010); ROA.8066 (Talbot et al. 2011).  Studies that fail to isolate gasoline exposure from exposure to other substances, or that fail to quantify gasoline exposure, cannot reliably support the conclusion that gasoline with benzene causes AML.  *See LeBlanc*, 393 F. App'x at 99 (disregarding study indicating "that the subjects were exposed to a range of substances and then nonspecifically not[ing] increases in disease incidence").

Third, Mrs. Burst concedes that several of the studies do not examine AML specifically.  *See* Br. 36–37 (acknowledging that "AML was not analyzed for separately" in Lindquist et al. 1991, Schnatter et al. 1993, Delzell et al. 1992, Bisby et al. 1998, Gun et al. 2000, Gray et al. 2001, Sorahan et al. 2007); *see also* Br. 38 (citing Schwartz 1987, Infante 1990, and Hunting et al. 1995 studies as demonstrating risk of leukemia in general, not AML specifically); *id.* (citing

Schnatter et al. 2012 as demonstrating an increased risk of MDS, not AML); ROA.8053–55.  Under this Court's precedent, studies that do not separately examine AML cannot provide reliable support for the conclusion that gasoline causes that particular disease.  *See, e.g.*, *Burleson*, 393 F.3d at 585; *Allen*, 102 F.3d at 197; *Henricksen*, 605 F. Supp. 2d at 1171–75.  Mrs. Burst ignores this problem, but even Infante effectively agreed with the point, testifying that the specific type of leukemia is "important" to determining general causation, ROA.8585, and that studies analyzing leukemia generally do not demonstrate that benzene in gasoline causes AML.  ROA.8588.  Thus, non-AML specific studies cannot reliably support his general causation opinion.

Fourth, as Mrs. Burst concedes, several of the studies do not show a statistically significant increased risk of AML.  Br. 36 (Sathiakumar and Rushton 1993 studies showed results that were "not statistically significant"); *id.* (Rushton/Romaniuk 1997 showed results that were only "close to being statistically significant"); ROA.8056 (Wong et al. 2010); ROA.8051–53.  Studies that do not represent statistically significant results do not provide a reliable foundation for an epidemiologist's general causation opinion in a toxic torts case. *Joiner*, 522 U.S. at 145; *LeBlanc*, 396 F. App'x at 99; *Allen*, 102 F.3d at 197; *Brock*, 874 F.2d at 311–13.

Fifth, Mrs. Burst references the Jakobsson study as showing "significantly elevated risks of AML" in "workers exposed to gasoline at gas stations." Br. 38. But again, that distorts the record. Although the study observed 10 cases of AML in male petrol station attendants versus 2.8 expected, yielding a statistically significant odds ratio of 3.6 (95% CI 1.7-6.6), it was later discovered that two of the AML cases handled other products, "[three] of the reported AML cases never worked as petrol service attendants, and three others only did so for a short time." *See Henricksen*, 605 F. Supp. 2d at 1173; *accord* ROA.8066. These facts sharply call into question the significance of the results. *See Henricksen*, 605 F. Supp. 2d at 1173.

Moreover, Mrs. Burst neglects to mention that the Jakobsson study concerned only the Swedish cohort of the much larger Lynge study, which is the single largest study of service station workers and involved 19,000 petrol station attendants from Denmark, Norway, Sweden, and Finland. *See* ROA.8066, ROA.8554, ROA.8758. In contrast to the roundly criticized Jakobsson study, the Lynge study observed "no excess risk of leukemia or specifically of [AML]." ROA.8057, ROA.8557, ROA.8704, ROA.8758. Nevertheless, Infante concluded that the Jakobsson study provided "some evidence in support of an association" between gasoline and AML, ROA.5058, without reconciling that opinion with the contrary results of the Lynge study. *See* ROA.8555–60.

### 3.     The secondary literature does not reliably support Infante's general causation opinion.

The district court also correctly rejected Mrs. Burst's attempt to support Infante's general causation opinion with statements made by regulatory agencies or defendants in certain non-scientific documents, such as material safety data sheets. *See* Br. 30–35, 39–40, 42–44.

Mrs. Burst fails to cite a single statement by any regulatory agency that actually determines that gasoline causes AML.  Rather, IARC has reached the opposite conclusion:  "[t]here is inadequate evidence for the carcinogenicity in humans of gasoline."  ROA.8043.  The ATSDR Toxicological Profile for Gasoline has likewise determined that "there is no conclusive evidence to support a finding that gasoline causes cancer."  R.8044.  Nor are those conclusions rendered "outdated" by the studies cited in Mrs. Burst's brief, which themselves do not find a statistically significant causal connection between gasoline and AML.  Br. 31.  In 2010, IARC excluded gasoline from a list of agents needing an updated review by a scientific panel of whether they are human carcinogens.  ROA.8757–60.

In any event, statements made by regulatory agencies cannot establish a reliable scientific basis for expert opinion in a tort case.  As this Court has recognized, the "preventive perspective that [] agencies adopt in order to reduce public exposure to harmful substances" leads to a "threshold of proof [that] is reasonably lower than that appropriate in tort law."  *Allen*, 102 F.3d at 198.  Tort

law "traditionally make[s] more particularized inquiries into cause and effect' and requires a plaintiff to prove 'that it is more likely than not that another individual has caused him or her harm.'" *Id.* (alteration in original); *accord Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 880 (2010) ("The mere fact that Plaintiffs were exposed to benzene emissions in excess of mandated limits is insufficient to establish causation. . . . [R]egulatory agencies are charged with protecting public health and thus reasonably employ a lower threshold of proof in promulgating their regulations than is used in tort cases."), *aff'd*, 533 F. App'x 509 (6th Cir. 2013); *Parker*, 857 N.E.2d at 1122 ("[S]tandards promulgated by regulatory agencies as protective measures are inadequate to demonstrate legal causation.").

Mrs. Burst's arguments about Appellees' documents, Br. 42–44, are similarly misleading and flawed. None of those documents states that gasoline can cause AML. But even if they did, internal documents like material safety data sheets, internal reports, and correspondence do not qualify as reliable scientific evidence. *See LeBlanc*, 396 F. App'x at 100 (finding that materials, including internal reports and correspondence, are "simply not scientific evidence" and "cannot meet the reliability requirement of *Daubert*"); *see also Johnson v. Arkema, Inc.*, 685 F.3d 452, 463 (5th Cir. 2012) (holding that district court did not abuse its discretion in disregarding material safety data sheets where expert "failed to come forth with any scientific data to support [their] warning" and that material safety

data sheets "standing alone, need not have been accorded any weight"); *Moore*, 151 F.3d at 278 (holding that district court did not abuse its discretion in finding material safety data sheets unreliable in part because the expert "did not know what tests [defendant] had conducted in generating" them).

### 4.   Mr. Burst's chromosomal damage does not render Infante's opinion reliable.

Mrs. Burst's arguments that her husband had an earlier MDS diagnosis and markers of benzene-related AML, including a particular chromosomal abnormality, fare no better. *See* Br. 53. Contrary to these assertions, the record conclusively demonstrates that Mr. Burst was *not* diagnosed with MDS. ROA.8896; ROA.8918; *see also* ROA.306. Moreover, although Infante reviewed studies analyzing a wide variety of DNA damage, those studies did not evaluate whether DNA damage caused by gasoline exposure in turn causes a specific form of cancer, like AML. *See* ROA.8537–40, 8803–04. More importantly, Infante did not rely on or reference a single scientific study showing deletions of chromosomes 5, 7, or both from gasoline exposures. ROA.5052–54; *see also* ROA.8803–04.

Mrs. Burst also inaccurately describes the evidence presented in *Henricksen* concerning chromosomal aberrations. As the court explained there, "[e]ither cytogenetic or a distinct pattern of chromosomal aberrations have been considered characteristic findings in nearly ninety percent of all secondary AML, which

includes AML caused by exposure to benzene *as opposed to gasoline containing benzene*." 605 F. Supp. 2d at 1149 (emphasis added). In *Henricksen*, the plaintiff's lack of chromosomal aberrations commonly found in benzene-related AML cases was only one of many reasons for the district court exclusion of Infante's opinion as unreliable. It does not follow that the existence of chromosomal damage, without more, renders reliable Infante's opinion that gasoline causes AML.

> **B.    The district court did not manifestly err in excluding Harrison's testimony.**

Mrs. Burst similarly has not carried her burden to show that the district court's exclusion of Harrison was "manifestly erroneous."

Harrison, like Infante, relied on scientific literature related to benzene—not gasoline. *See* ROA.7922–25. Harrison conceded that there are many epidemiologic studies concerning occupational exposure to gasoline, including the hematologic effects of such exposure. ROA.4753. But when asked if he could "name a single study in which workers exposed to gasoline developed hematologic malignancies at a higher rate . . . [than the] general population or control group," he had no answer: "You know, again, I don't know. I'd have to examine the papers. I'm not prepared to answer your question here." ROA.4754; *see* ROA.4753 (failing to provide the name of a single study regarding gasoline exposure). Harrison also admitted that he did not examine gasoline-specific

scientific literature, such as the IARC monograph on gasoline, because "[he] didn't consider it particularly relevant.  [He] was focusing on benzene."  ROA.4757; *see also* ROA 4758 (testifying that he "didn't think [the IARC Monograph on gasoline was] particularly pertinent to the central question in this case"); ROA.4761–62 (testifying that he did not consider the ATSDR toxicological profile on gasoline, despite knowing that such a profile evaluates all of the evidence and epidemiology of a substance to determine if it is a human carcinogen).

Moreover, as the district court explained, even if Harrison had relied on gasoline-specific studies, his opinion would still be inadmissible because his report failed to demonstrate any methodology for reaching his opinions.  ROA.7927.  He neither performed any critical evaluation of the studies nor considered any of the recognized scientific factors, such as "strength of association, replication of findings, [or] specificity of the association."  ROA.7927.

Harrison's purported reliance on Infante's unreliable opinions adds nothing.  While experts may rely on the reliable opinions of other experts, *see* FED. R. EVID. 703, they cannot adopt another expert's opinions "wholesale."  *Mooring Capital Fund, LLC v. Phoenix Cent., Inc.*, No. CIV-06-0006-HE, 2009 WL 4263359, at *5 (W.D. Okla. Feb. 12, 2009) (not designated for publication) (holding that an expert may rely "on the opinions of other experts so long as it does not involve the wholesale adoption of another expert's opinions without attempting to assess the

validity of the opinions relied on"). An expert must conduct some independent analysis to evaluate another expert's methodology and assess the validity of that expert's opinions before relying on them. *Id.*; *In re TMI Litig.*, 193 F.3d 613, 715–16 (3d Cir. 1999) (finding that an expert's methodology was flawed when he relied entirely on another expert's report without conducting any independent assessment); *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732–33 (10th Cir. 1993) (affirming exclusion of expert opinion that relied on another expert's report properly excluded); *Lightfoot v. Hartford Fire Ins. Co.*, No. Civ. A. 07–4833, 2011 WL 39010, at *4 (E.D. La. Jan.4, 2011) (not designated for publication) ("Rule 703 does not allow 'the wholesale adoption' of another expert's opinions without attempting to assess the validity of the opinions relied on.").

Harrison failed to analyze any studies cited in Infante's report and made no effort to assess the validity of his conclusions. ROA.7928. Indeed, had he performed the required analysis, he would have realized that Infante's report was seriously flawed. The district court thus correctly held that Harrison's "wholesale" adoption of Infante's report cannot provide a reliable basis for Harrison's opinion. *See* ROA.7928.

Because the district court properly excluded both Harrison's and Infante's general causation opinions, this Court should affirm the summary judgment ruling.

As Mrs. Burst concedes, absent these opinions, she "could not prove medical causation." Br. 13.

## III.  In the alternative, the district court's summary judgment should be affirmed because Mrs. Burst has offered no reliable evidence of specific causation.

The district court's judgment can also be affirmed on the alternative ground that Mrs. Burst failed to present any reliable evidence of specific causation.

Mrs. Burst's assertion that "this appeal is limited to general causation," Br. 10, ignores this Court's harmless error doctrine. *Knight*, 482 F.3d at 355 (holding that "[e]ven if this court did find that the district court abused its discretion by excluding" the plaintiffs' general causation experts, that decision must be reviewed under the "harmless error doctrine"). It also ignores the longstanding rule that this Court is "not limited to the district court's reasons for its grant of summary judgment and may affirm the district court's summary judgment on any ground raised below and supported by the record." *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir 2014) (internal quotation marks omitted); *accord Tiblier v. Dlabal*, 743 F.3d 1004, 1007 & n.4 (5th Cir. 2014).

Appellees moved for summary judgment on the independent ground that Mrs. Burst adduced no reliable and admissible expert testimony on specific causation because she offered no scientifically reliable estimate of Mr. Burst's benzene exposure from gasoline. ROA.7051–53. To establish specific causation,

Mrs. Burst was required to establish the level (or dose) of harmful chemicals to which Mr. Burst was allegedly exposed. *See* REFERENCE GUIDE at 403; *see also McClain*, 401 F.3d at 1242 ("Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect.") (internal quotation marks omitted). Without this data, Mrs. Burst cannot carry her burden to show that Mr. Burst's AML was caused by his exposure to gasoline. *Allen*, 102 F.3d at 198.

In an attempt to establish specific causation, Mrs. Burst relied principally on Miller's testimony. But as the district court found, Miller's estimation of Mr. Burst's cumulative dose of benzene exposure from gasoline was "result driven," based on an unreliable methodology and inadequate data, ROA.7037, and produced "an exposure assessment that is likely artificially high and that is not reasonably based on the factual record but instead on speculation," ROA.7050. Mrs. Burst has not challenged that ruling on appeal. As a result, she has forfeited any argument that the district court abused its discretion in excluding Miller. *See, e.g.*, *Royal Ins. Co. of Am. v. Quinn–L Capital Corp.*, 960 F.2d 1286, 1293 (5th Cir. 1992) (holding that an unappealed order is a final judgment on the merits for res judicata purposes); *Little Earth of the United Tribes, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 807 F.2d 1433, 1437 (8th Cir. 1986) ("[T]he law of the case doctrine binds the parties to the unappealed district court orders . . . .").

The argument would be meritless even if it had been preserved. First, Miller's estimate for Mr. Burst's inhalation exposure of benzene was unreliable because it assumed that Mr. Burst was exposed to an immediately lethal level of gasoline vapors.[6] *See* ROA.3807; ROA.3811–12; ROA.3856–58. Miller admitted in his deposition that his calculation "was a mistake," and that such high levels of gasoline vapor would have been "immediately dangerous to life and health." ROA.3858–59.

Second, Miller's dermal exposure estimate from Mr. Burst's washing parts in gasoline as part of his mechanic duties is also unreliable. Miller assumed Mr. Burst's hands were continuously exposed to gasoline while washing parts, ROA.6043, even though Mr. Burst's co-worker testified that the station attendants spent only 15% to 20% of the day washing parts. ROA.3813–14, 3820–22. Miller also failed to consider the effects of evaporation, ROA.6017–18, 6020–21, even though he accounted for evaporation in his estimate concerning inhalation exposure. ROA.3806, 3809, 3815, 3819. As the district court recognized, "this inconsistency is especially problematic from a reliability standpoint because Miller accounted for evaporation when it increased his cumulative exposure estimate as

---

[6]    Miller estimates that the garage in which Mr. Burst worked contained 50.9 ppm benzene vapor levels, which means that the gasoline vapor level in the garage must have been over 8,449 ppm. ROA.3811–3812, 3856–3858 (relying on data that shows that total gasoline vapor level for gasoline containing 1% benzene is 166 times greater than the benzene vapor level). Miller's own report shows that his estimated gasoline vapor level would be instantly lethal. ROA.3807.

with his inhalation exposure estimate . . . , but did not account for evaporation . . . when it would likely have decreased his estimate significantly." ROA.7039.

Third, Miller relied solely on Mrs. Burst's uncorroborated, self-reported symptoms, which she based on her recollection of events that occurred more than 40 years ago. ROA.3811–12. Miller did not make any effort to validate his assumptions by comparing them to scientific literature measuring actual exposure levels. ROA.6063–66. And he failed to cite any source indicating that his methodology is generally accepted in the scientific community. ROA.6063–66. As the district court found, "there is no evidence in the record besides Miller's own assurances to suggest that non-contemporaneous self-reported symptoms of a secondary source can form the sole basis for an exposure assessment opinion." ROA.7045.

None of Mrs. Burst's other experts provided testimony sufficient to establish specific causation. Mitchell, a meteorologist with no relevant expertise, admitted that he never calculated an estimated cumulative dose of exposure to gasoline containing benzene for Mr. Burst. ROA.4068–69 ("Q: As we sit here today, are you able to give me a time-weighted average of the cumulative benzene exposure that Mr. Burst had as a result of his work at the various gas stations? A: No.").[7]

---

[7] Mitchell's exposure assessment opinions also fail to offer any relevant assessment of potential exposures at Shell service stations. His opinions are based solely on Mr. Burst's work conditions at a Gulf Oil service station in New Orleans. ROA.3016–19. Specifically, he relied

Infante and Harrison largely just relied on Miller's unreliable estimates. *See* ROA.7160–11, ROA.7361. Infante's own weak attempts to estimate Mr. Burst's benzene exposures from pumping gasoline and cleaning parts do not suffice to show specific causation.[8] Like Miller, Infante relied on Mrs. Burst's self-reported symptoms from events that she claimed occurred more than 40 years earlier. ROA.7158–59. In particular, Infante recounted that Mrs. Burst has told him that she would get lightheaded after being in the area where Mr. Burst was working for about 15 minutes. ROA.7158–59. Infante then speculated that "since Mrs. Burst experienced lightheadedness while observing her husband cleaning parts with gasoline for about 15 minutes, the total gasoline vapor in the air is likely to have been about 4,000 ppm" gasoline vapor, from which Infante calculated a benzene exposure estimate of 56.7 ppm. ROA.7159. Notably, Infante's estimate is more than three times higher than Miller's 18 ppm estimate, even though Miller relied

---

exclusively on Frank Simpson's deposition testimony to determine Mr. Burst's working conditions and distance from the emission source at Shell service stations. ROA.3016–19. But it is undisputed that Simpson worked with Mr. Burst at a Gulf service station, and Mitchell admitted that he had not seen any testimony from Simpson concerning Mr. Burst's work at any Shell gas station. ROA.3016–19. Mitchell's wholesale reliance on unsubstantiated assumptions to compare Mr. Burst's work at Gulf Oil service station to his work at Shell service stations is improper. Thus, at a minimum, Mitchell's reports and any related testimony have no relevance to Shell.

[8]    Although Infante mentioned exposures from tank gauging and skin absorption, he did not calculate an estimated dose of benzene exposure from these activities. ROA.7157–59, ROA.7230–31.

on the same anecdotal recollections of events occurring decades ago. *Compare* ROA.7159 (Infante), *with* ROA.2534–35 (Miller).

Infante cited no source indicating that the use of non-contemporaneous, self-reported symptoms of a secondary source is an acceptable methodology. *See* ROA.7159. Nor did he validate his results. *See* ROA.7159. He also did not counter Appellees' evidence that the "effect threshold of gasoline" is an unreliable indicator of a chemical's airborne concentration because, among other reasons, the presence of an odor can result in self-reported symptoms unrelated to the chemical itself. *See* ROA.3952–54, ROA.7063.

In short, with no reliable estimate of the level of benzene from gasoline to which Mr. Burst was exposed, Mrs. Burst cannot meet her burden to establish specific causation. The district court's summary judgment can therefore be affirmed on this alternative ground.

\* \* \*

Mrs. Burst chose to litigate this case on the scientifically baseless assertion that merely because gasoline contains small amounts of benzene, it can be assumed to be a human carcinogen capable of causing AML. The district court saw through that misdirection and, exercising its broad discretion under Rule 702, properly excluded the unreliable and unsubstantiated expert opinions of Mrs. Burst's experts. She has not carried her heavy burden to show that the district court

manifestly erred.    To the contrary, consistent with other courts that have considered similar issues, the district court's exclusion rulings and summary judgment for Appellees were correct and entitled to deference.

## CONCLUSION

For the foregoing reasons, Appellees respectfully request that the Court affirm the district court's judgment in its entirety.

Respectfully submitted,


*/s/ Lauren Tanner Bradley*
Macey Reasoner Stokes
Amy Pharr Hefley
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1234
(214) 229-7869 (fax)
macey.stokes@bakerbotts.com
amy.hefley@bakerbotts.com

Lauren Tanner Bradley
BAKER BOTTS L.L.P.
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
(512) 322-2500
(512) 322-2501 (fax)
lauren.bradley@bakerbotts.com

*Counsel for Appellees Shell Oil Company,
Chevron U.S.A. Inc. and Texaco Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of December, 2015, copies of the foregoing appellees' brief were electronically filed with the Court and served by the same means on:

Richard J. Fernandez
Amber E. Cisney
Richard J. Fernandez, LLC
3000 W. Esplanade Ave.
Metairie, Louisiana 70002
(504) 834-8500

Lynn Eric Williams, Jr.
Williams Law Office, LLC
433 Metairie Rd., Suite 401
Metairie, Louisiana 70005
(504) 832-9898
eric@amlbenzene.net

Keith E. Patton
Shrader & Associates, LLP
3900 Essex Lane, Ste. 390
Houston, Texas 77027
(713) 782-0000

*Counsel for Appellant Yolande Burst*

*/s/ Lauren Tanner Bradley*
Lauren Tanner Bradley

# CERTIFICATE OF COMPLIANCE

with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,419 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word XP in Times New Roman 14-point font.

*/s/ Lauren Tanner Bradley*
Lauren Tanner Bradley


December 21, 2015

# Appendix A

**KEY SHORTCOMINGS OF PUTATIVE 'GASOLINE' STUDIES RELIED ON BY INFANTE**

| Schwartz 1987 | • Examines leukemia generally, not AML.  ROA.8054; ROA.8584.<br><br>• Identifies only one case of AML, out of a total of 8 cases of leukemia among auto mechanics, in the age group of 20 to 29.  ROA.1274–88.<br><br>• Does not isolate gasoline exposure or provide exposure metrics; instead, analyzes workers exposed to "gasoline vapor, benzene, solvents, lubricating oils, and asbestos (from brake and clutch repair) as well as welding fumes, and car and truck exhaust," and ultimately concludes that "the results of this analysis suggest that one or more of the exposures experienced by automobile mechanics and service station workers poses a carcinogenic risk."  ROA.1274; ROA.8048.<br><br>• "More definitive epidemiologic studies are required to determine if the leukemia excess is associated with exposure to benzene, gasoline, or other workplace substances."  ROA.1274; ROA.8048–49. |
|---|---|
| Lindquist et al. 1991 | • Does not isolate gasoline exposure or provide exposure metrics; instead, analyzes professional drivers exposed to petroleum products, including gasoline, diesel, aircraft fuels, and their combustion products.  ROA.8049.<br><br>• Examines acute leukemia generally, not AML specifically, finding only "an etiological relationship between the development of acute leukemia and exposure to petroleum products as fuel and exhaust."  ROA.8049, ROA.8055; ROA.8511. |
| Delzell et al. 1992 | • "AML was not analyzed for separately."  Br. 36.<br><br>• Published version (Sathiakamur et al. 1995) showed results were not statistically significant.  ROA.7223. |

| Jakobsson et al. 1993 & 1996 | • Swedish cohort of a much larger Lynge study that involved 19,000 petrol station attendants—the single largest study of service station workers—from Denmark, Norway, Sweden, and Finland and observes "no excess risk of leukemia or specifically of [AML]." ROA.8053; ROA.8057; ROA.8066; ROA.8554–56; ROA 8560.<br><br>• Although authors initially observe 10 cases of AML in male petrol station attendants versus 2.8 expected, yielding a statistically significant odds ratio of 3.6 (95% CI 1.7–6.6), they later note that two of the AML cases handled other products; and others discover that "three of the reported AML cases never worked as petrol service attendants, and three others only did so for a short time." ROA.8066; *see also Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1173 (E.D. Wash. 2009). |
|---|---|
| Rushton et al. 1993 | • Does not show a statistically significant increased risk of AML. Br. 37; ROA.8052. |
| Schnatter et al. 1993 | • Examines association between truck drivers exposed to "finished hydrocarbons" and leukemia. ROA.8050.<br><br>• Acknowledges "no knowledge concerning the actual levels of benzene experienced by these truck drivers." ROA.8050.<br><br>• "AML was not analyzed for separately," Br. 36; instead, examines leukemia generally. ROA.8055. |
| Wong et al. 1993 | • Examines gasoline distribution workers. ROA.8060.<br><br>• Authors observed no statistically significant increased risk for AML in workers exposed to gasoline. ROA.7504; ROA.8051–52; ROA.8060.<br><br>• Infante created statistically significant results only by adjusting study. ROA.5060; ROA.8060–61; ROA.8510; ROA.8643; ROA.8774. |

| Hunting et al. 1995 | • Examines leukemia and aleukemia; while noting one case of AML, does not provide any separate analysis for the risk of AML. ROA.1112–53; ROA.8054.<br><br>• Does not isolate gasoline exposure or provide exposure metrics. ROA.1112–53.<br><br>• Notes that, in addition to gasoline, workers had potential "exposure to degreasing agents, diesel fuel, asbestos from brake work, used motor oils, Varsol, a degreasing solvent that contains 1% benzene, . . . spray cans of brake, battery, or carburetor cleaner," and that some workers also "experienced other exposures during welding, spray painting, sheet metal work, carpentry, and tire repair operations." ROA.1116; ROA.8049. |
|---|---|
| Sathiakamur et al. 1995 | • Examines risks associated with exposure to crude oil, not gasoline. ROA.8049.<br><br>• Does not show a statistically significant increased risk of AML. Br. 36; ROA.8650. |
| Terry et al. 1995 | • Does not isolate gasoline exposure or provide exposure metrics; instead, examines associations between self-reported occupations and hobbies and acute leukemia risk. ROA.8050. |
| Rushton/ Romaniuk 1997 | • Examines associations between leukemia generally in distribution workers exposed to crude oil. ROA.1249–63; ROA.8058–59.<br><br>• Does not show a statistically significant increased risk of AML. Br. 36; ROA.8058. |
| Bisby et al. 1998 | • "AML was not analyzed for separately." Br. 36. |
| Gun et al. 2000 | • Analyzes association between terminal workers and leukemia generally. ROA.8049.<br><br>• "AML was not analyzed for separately." Br. 36. |
| Gray et al. 2001 | • Analyzes association between terminal workers and leukemia generally. ROA.8525.<br><br>• "AML was not analyzed for separately." Br. 36. |

| Sorahan et al. 2002 | • Involves oil refinery and petroleum distribution workers. ROA.8062. |
| | • Does not show a statistically significant increased risk of AML. ROA.5061; ROA.8052–53; ROA.8062–63. |
| | • Infante created statistically significant results only by adjusting study. ROA.5061; ROA.8513–14; ROA.8062–63. |
| Sorahan et al. 2007 | • Examines oil refinery workers and petroleum distribution workers. ROA.8514. |
| | • "AML was not analyzed for separately." Br. 37. |
| | • Does not show a statistically significant increased risk of AML. ROA.8514; ROA.8670. |
| Wong et al. 2010 | • Does not provide exposure metrics; instead, examines associations between AML and various occupations in China. ROA.8673–74. |
| | • Did not examine gasoline station attendants. ROA.8676. |
| | • Does not show a statistically significant increased risk of AML overall or between gasoline and AML exposure specifically. ROA.8052–53; ROA.8056. |
| | • Increased risk among loading and unloading workers at train stations, truck depots, airports, marine terminals and warehouse loading docks irrelevant because no evidence of what they were loading or unloading. *See* ROA.8056; ROA.8526–27; ROA.8680; *see also* Br. 37. |
| Talbot et al. 2011 | • Examines risk of leukemia and AML in residents of Pennsylvania community affected by a gasoline spill in the 1990s. ROA.8066. |
| | • Does not provide exposure metrics, and authors note that "[t]he lack of specific individual level exposures . . . is a limitation of the study." ROA.8066. |
| Schnatter et al. 2012 | • Shows increased risk of AML from benzene exposure only for tanker truck drivers, not gasoline station attendants or auto mechanics. ROA.7700; ROA.8528. |
| | • Authors conclude that "[r]elatively low-level exposure to benzene experienced by petroleum distribution workers was associated with an increased risk of MDS, but not AML, suggesting that MDS may be the more relevant health risk for lower exposures." ROA.7693. |

| Rushton et al. 2014 | • Shows increased risk of AML from benzene exposure only for tanker truck drivers, not gasoline station attendants or auto mechanics. ROA.8528–29. |
| | • Authors conclude that "[w]hile some patterns among terminal workers, who tend to have relatively high benzene exposure, suggest a relationship between AML and benzene, the overall evidence does not persuasively demonstrate a risk between benzene and AML." Rushton, L., et al., *Acute Myeloid and Chronic Lymphoid Leukemias and Low-Level Benzene Among Petroleum Workers*, 110 BR J CANCER 783 (2014). |